(Reap. Dec. 8196)

JOHN A. STEER & Co. v. UNITED STATES

Entry No. DC 3727.

(Decided January 23, 1953)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney), for the defendant.

RAO, Judge: By stipulation of the parties, the only question raised by this appeal for reappraisement is whether an item of inland freight, shown on the invoice as $146.32, properly forms part of the statutory export value of an importation of 268 reels of M. F. sulphate wrapping paper from Finland. This merchandise was entered on the basis of export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, at United States dollars 10.20 per 100 pounds, net, packed, less charges on the entire shipment for consular fee, forwarding and lading, inland freight, marine and war risk insurance, and ocean freight. Appraisement was likewise made on the basis of export value at United States dollars 10.20 per 100 pounds, net, packed, less all the deductions made on entry, except the item of $146.32 for inland freight.

It has also been agreed that, on or about the date of exportation of the imported M. F. sulphate wrapping paper, such or similar paper was not freely offered for sale for home consumption in Finland, but that it was freely offered for sale to all purchasers in the principal markets of Finland, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at a price of United States dollars 10.20, per 100 pounds, net, packed, c. i. f. Philadelphia, Pa., U. S. A.

Section 402 (d) of the Tariff Act of 1930, defining export value, provides as follows:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The only evidence in the case, aside from the written stipulation of the parties, consists of an affidavit of Holger Nysten, general manager of the Finnish Paper Mills Association, marked plaintiff's exhibit 1, and an affidavit of Albert Jansson, office manager of said asso-

ciation, received in evidence as defendant's exhibit A. The averments contained in these affidavits are not in conflict. They establish that there exists in Finland an organization known as the Finnish Paper Mills Association which is the sole selling agency for all papers manufactured in that country, except certain high-grade (rag tissue) paper not here in issue. The office of this association is located in Helsinki (also known as Helsingfors). Through that office, all sales and offers of sale of paper produced in Finland are made, and all orders for the purchase of such paper are accepted.

Individual mills for the manufacture of sulphate wrapping paper are located elsewhere in Finland than at Helsinki. The mill owners do not freely offer their products nor sell any of them for exportation to the United States, all sales being consummated through the association at Helsinki. No stocks of sulphate wrapping paper are maintained at Helsinki for the filling of orders, as all paper is shipped direct from the mill producing it to the purchaser's destination. In the case of export shipments, the merchandise goes to the Finnish seaport most conveniently located to the mill, shipping conditions permitting. Since Helsinki is, itself, a seaport, sometimes, though on relatively few occasions, paper is exported through that city. When that occurs, the paper is transported directly from the mill producing it to the ship upon which it is to be exported, and is never shipped to the Finnish Paper Mills Association in Helsinki for transshipment.

At the time of exportation of the instant merchandise, such paper was freely offered to all purchasers, except E. W. Twitchell, Inc., of Philadelphia, Pa., the ultimate consignee herein, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, at United States dollars 10.20 per 100 pounds, net, packed, c. i. f. Philadelphia, which price included all of the charges hereinbefore enumerated. The price to E. W. Twitchell, Inc., at the time of exportation was United States dollars 9.70 per 100 pounds, net, packed, c. i. f. Philadelphia. Said prices were the only prices for this quality and substance for exportation to the United States, and were the same regardless of the quantity or the port in Finland from which the merchandise was exported to the United States.

The paper covered by the instant sale was manufactured by W. Rosenlew & Co., whose mill is located at Björneborg, Finland, and was exported through the Finnish port of Hangö. Both of said cities are west of Helsinki, and the railroad connecting them does not pass near or through Helsinki.

This being all the evidence in the case, it is apparent, in view of the stipulation of the parties and the provisions of section 402 (d), *supra*, that I am here concerned with the question of what was the freely offered price for exportation of such or similar merchandise in the principal markets of the country of exportation, at the time of exportation.

In this connection, I do not consider as material the fact, urged by plaintiff, that sulphate paper was not available for delivery in Helsinki, nor that title never passed from seller to purchaser in that city. Export value as defined in section 402 (d), *supra*, is concerned with the price at which merchandise is offered for sale, and sold, and not with the place where merchandise is to be delivered in fulfillment of the contract of sale, and the principal market is to be found where sales, not deliveries, are made. *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. (Customs) 33, C. A. D. 341.

It would appear from this record that the only place in Finland where such or similar merchandise was freely offered for sale for exportation to all purchasers was the city of Helsinki, and, by agreement of the parties, the price in such market was United States dollars 10.20 per 100 pounds, net, packed, c. i. f. Philadelphia, Pa. Included in said price were, of course, certain charges, such as forwarding and lading fees, consular fee, marine and war risk insurance, and ocean freight, which, because they ordinarily accrue subsequent to the time when the merchandise is in the principal market, in condition, packed ready for shipment to the United States, are not, and, since the act of 1890, have never been, considered as dutiable items. *The John Shillito Company* v. *United States*, 5 Treas. Dec. 555, T. D. 23851; *United States* v. *Samuel Shapiro & Co. et al.*, 65 Treas. Dec. 1650, Reap. Dec. 3268; *International Commercial Co., Inc., and Armour & Co.* v. *United States*, 26 Cust. Ct. 607, Reap. Dec. 7980, affirmed, 28 Cust. Ct. 629, Reap. Dec. 8112.

It further appears that the price in Helsinki for the period pertinent to the exportation of the merchandise at bar did not vary with respect to either the quantity purchased, the port in Finland from which the merchandise was exported, nor the distance between factory and seaport. This latter circumstance seems to me to be the decisive factor in this case. Whether the merchandise was, as here, shipped from a factory in Björneborg, Finland, to the seaport city of Hangö, or was produced in a mill located in Hangö, in which case there would be no charge for inland freight, or came from a factory located at a site a greater distance from a seaport than that between Björneborg and Hangö, thus necessitating a greater freight charge, the price to the purchaser in the principal market, Helsinki, remained the same, and did not fluctuate with the difference in freight charges.

Moreover, in every instance in which merchandise was shipped through the principal market, to wit, Helsinki, in view of the stipulated fact that there were no factories in that city, freight charges, from a factory, were necessarily incurred. The costs of such charges would, of course, vary in amount in direct ratio with the distance from any given factory, but the freely offered price would be the same. In other words, in order to place the merchandise in condi-

tion, packed ready for shipment to the United States, in the principal market of Finland, it had to be brought there from a factory located elsewhere. Whether or not such charges were reflected in the freely offered price is not, however, a fact here of record.

Nevertheless, to allow a deduction of this disputed item in the case of each purchase would result in there being as many values for customs purposes as there were variations in physical distances and costs of transportation from factory to seaport. Yet, the law does not contemplate more than one price for the same merchandise at the same time in the same market. *United States* v. *Zellerbach Paper Co. (Hoyt, Shepston & Sciaroni)*, 28 C. C. P. A. (Customs) 303, C. A. D. 159.

I am of opinion that the cases of *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T. D. 41454; *United States* v. *Traders Paper Co. et al.*, 14 Ct. Cust. Appls. 293, T. D. 41909; and *United States* v. *Zellerbach Paper Co., supra*, are controlling of the question raised in this case. Although the cited cases dealt with foreign value, as defined in section 402 (c) of the Tariff Act of 1930; or its predecessor provisions, rather than with export value, the principles of those decisions are nevertheless applicable here, in view of the similarity in statutory definitions of foreign and export values. For convenience of reference, section 402 (c), as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1402 (c)), is set forth in the margin below.[1] From a comparison of the two provisions, it may be stated generally that foreign value is the freely offered price in the principal markets for home consumption; export value, the freely offered price in the principal markets for exportation. Other variances in phraseology do not warrant the application of different principles of law to the issue here involved.

In the case of *United States* v. *Heffernan Paper Co., supra*, the sole question was whether inland freight between Berlin and Hamburg, Germany, for brown sulphite kraft wrapping paper, offered for sale for domestic consumption at a price of 38.20 gold marks per 100 kgs., f. o. b. Hamburg, was a deductible item. It appeared that the inland price always included freight charges, although sometimes freight was collected on delivery, in which case the amount thereof was either refunded by the manufacturer, or deducted from the invoice price. In holding that inland freight was not a deductible item, the court stated:

---

[1] (c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

But assuming that Berlin was one of the principal markets of Germany at the time of export and that Hamburg was not, it became necessary for the appraiser, under the law, to find the price at which the goods imported were freely offered for sale at that time, in Berlin. When so found, that was the foreign value. The record shows plainly what this price was. It was 38.20 gold marks per 100 kgs., delivered. Whether the goods were delivered at Wismar, or Hamburg, or in Berlin itself, the price was 38.20 gold marks. Evidently the expenses of delivery, including freight, were estimated, distributed, and incorporated in the sales price and thus it resulted that the purchaser having goods delivered in Berlin upon which there were no freight charges, contributed to the expense of delivering similar goods to the customer at Wismar or Hamburg. It is a matter of common knowledge that much the same system is practiced by many of our mercantile retailing establishments in this country. But whether the goods are delivered at the expense of the seller or carried away by the purchaser, without expense, the price is the same.

* * * In the case at bar, however, if inland freight be allowed, the importer is given a dutiable value for his goods which is less than the price at which they can be bought, on the open market, in Berlin. Such a result, manifestly, was not in the mind of Congress when it enacted subsection (b) of section 402.

Factually, almost identical with the case at bar is *United States* v. *Traders Paper Co. et al., supra,* wherein it was held that inland freight should not have been deducted from the home market value of kraft paper. In the court's own words, the facts were as follows:

The evidence discloses that the sales of kraft paper and wrapping paper in Germany are controlled through a conference of the manufacturers; that when sold for consumption in Germany they are sold f. o. b. "destination in Germany;" that the paper for export is manufactured at, and shipped from, mills located advantageously for economical freight costs; that Berlin is the chief market for the paper; that the convention seat is Berlin, and that the prices are fixed there; that inland freight rates differ in accordance with the location of the mill, the rates being from 2.50 to 7.50 *marks* per 100 kilos, the fair average being 5 *marks* per 100 kilos. [Italics quoted.]

It further appeared that the delivered price was the same, regardless of the distance from mill to destination, and that the merchandise was always sold f. o. b. point of destination. In commenting upon the facts, the court stated:

* * * There is no controversy about the facts that Berlin is the principal market; that no paper is actually sold f. o. b. at the factory; and that it is always sold f. o. b. place of destination at the same price regardless of the amount of freight. It being clear that there was no factory price and that the only price or value which could be found from the evidence was the price asked and obtained for delivery at the place of destination, it seems to us that this should be the correct home market value, and that this case is controlled absolutely by this court's decision in *United States* v. *Heffernan Paper Co.,* 13 Ct. Cust. Appls. 593, T. D. 41454, which case involved almost the same facts as the case at bar.

The *Zellerbach Paper Co.* case, *supra,* also involved the question of the deductibility of an item of inland freight, representing the cost of shipping matrix board from the places of manufacture in Germany to Hamburg or Bremen, the ports of exportation. Terms of sale were

always f. o. b. Bremen or Hamburg, the factories being located approximately 150 miles away from those ports. The court there held that since the price was a delivered price, paid by all purchasers in Germany, no matter where located, the amount paid being the same in every case, that price was the foreign value of the merchandise.

The three last-quoted cases settled conclusively the proposition that when sales are made f. o. b. point of destination, the price remaining the same, regardless of such destination within the country, and no sales are ever made ex-factory, the f. o. b. delivered price, which may or may not include actual freight charges, is the freely offered price within the meaning of the foreign value statute.

Under the law of sales, in the absence of specific contract provisions, where merchandise is sold on an f. o. b. basis, title ordinarily passes at the f. o. b. point. Therefore, when that point is a place elsewhere than the seller's place of business, an f. o. b. price is a delivered price. In the case of c. i. f. transactions, under the circumstances of no contrary contract specifications, title ordinarily passes when the merchandise is placed on board the vessel at the port of exportation. Corpus Juris Secundum, volume 77, pp. 1053–1054. To the extent then that the seller bears the risk either to the f. o. b. site, or to the c. i. f. port of exportation, and all charges incurred in bringing the merchandise to that point, the nature of the two transactions is essentially the same.

Although the place where title passes, if it be other than the place where merchandise is freely sold or offered for sale, has no bearing upon the question of what constitutes the principal market, it is here alluded to for the sole purpose of expressing the similarity in nature between f. o. b. point of destination and c. i. f. American port transactions. Of course, in the case of c. i. f. American port price quotations, certain charges are included in the price which, as heretofore noted, have consistently been held to be nondutiable, for the reason that they accrue or attach upon or after exportation from the country of exportation. But in view of the essential identity between f. o. b. and c. i. f. transactions, up to the point when these additional deductible charges accrue, the same rules ought to apply for determining whether or not inland freight is deductible. An application of those rules as enunciated in the three last-cited cases establishes that the law does not contemplate a deduction of this inland freight charge.

In any event, neither in the instant case nor in the foregoing three authorities was the merchandise ever offered for sale at an ex-factory price. As stated by the third division of this court in the case of *United States* v. *Samuel Shapiro & Co. et al., supra,* wherein was involved a determination of export value of merchandise offered for sale in Belgium on a c. i. f. New York or Baltimore basis:

Whether or not inland freight is included in the statutory export-market value depends in each case upon whether the goods could have been purchased for delivery at the factory at a price not including the said charges. Citing *United States* v. *Heffernan*, 13 Ct Cust. Appls. 593, T. D. 41454; *United States* v. *Traders Paper Co.*, 14 Ct. Cust. Appls. 293, T. D. 41909; and *United States* v. *Ossola Bros.*, T. D. 44636. The record before us does not contain sufficient evidence on this point to support a finding that the inland carriage charges are nondutiable.

The presence or absence of an alternative, quoted ex-factory price serves as well to distinguish the case of *International Commercial Co., Inc., and Armour & Co.* v. *United States, supra,* cited and relied upon by plaintiff, for it there appeared that offers of sale were made ex-plant or on an f. a. s. basis, with the purchaser undertaking to make all arrangements and paying all charges for exportation. In that case, therefore, there was a freely offered price which did not include the charge claimed not to be a part of the value of the merchandise. No such alternative plan was available to purchasers of the instant merchandise in the principal market of Finland.

In view of the foregoing considerations, I am of opinion that the appraiser properly disallowed the claimed deduction.

I, therefore, make the following findings of fact:

1. The merchandise consists of 268 reels of M. F. sulphate wrapping paper, exported from Finland on or about February 14, 1948.

2. That, on or about the date of exportation, such or similar merchandise was not freely offered for sale for home consumption in Finland.

3. That, on or about the date of exportation, such or similar merchandise was freely offered for sale to all purchasers for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, at United States dollars 10.20 per 100 pounds, net, packed, c. i. f. Philadelphia, Pa.

4. That included in the c. i. f. price were the following charges:

| | |
|---|---|
| Consular fee | $2. 50 |
| Forwarding and lading | 16. 84 |
| Inland freight | 146. 32 |
| Marine and war risk insurance | 56. 57 |
| Ocean freight | 338. 15 |

5. That, on or about the date of exportation, all sales and offers of sale for such or similar merchandise were made at Helsinki, Finland, at a c. i. f. Philadelphia, Pa., price, and no sales or offers of sale were made on an ex-factory basis.

I conclude, therefore:

1. That the principal market for the sale of such or similar merchandise was Helsinki, Finland.

2. That the charge for inland freight was not a deductible item.

3. That the proper basis of value for the instant merchandise is export value, as that value is defined in section 402 (d) of the Tariff Act of 1930.

4. That such export value is $10.20 per 100 pounds, net, packed, less consular fee, forwarding and lading charges, marine and war risk insurance, and ocean freight, as found by the appraiser.

Judgment will be entered accordingly.